At this point, we will now turn to Mr. Lackey's opportunity to address the claim against Ceja. So, you may proceed. Getting to Ceja, we look at what was before the court, and that is the Hassebrock sixth amendment complaint. That's in five camps. Now then, we have filed two motions for dismissal under 2-619. One based upon a general release given to DPROC, and the other based on the five-year statute of limitations. We believe there's no issue of material fact at all as to those affirmative defenses. In the first place, in the first four counts, there is no claim of an oral agreement whatsoever. Those are based upon an alleged oral joint venture agreement. The time to bring an action to enforce an oral agreement is five years. The time to bring an action for breach of fiduciary duties is five years. Counts 2, 3, 4 each allege that the wrongful act of Ceja in excluding Mr. Hassebrock from the alleged oral joint venture occurred in October and November of the year 2000. Mr. Hassebrock filed a record, and we have a certified copy of that in the record. In fact, it's attached to an abstract on our brief, where he made a claim of record asserting a joint venture between himself, Ceja, and DPROC, and listed all the oil and gas leases which are involved here and claimed an interest in them as part of that joint venture. That was filed of record in May of 2002. In June of 2002, a lawsuit was instigated in Marion County by DPROC to remove that claim of record as a cloud on title. Hassebrock immediately filed a counterclaim asserting his interest in this alleged joint venture. It's the same joint venture, almost verbatim, in the litigation with DPROC, in the claim that was filed of record, and the lawsuit pending now against Ceja Corporation. It's the same thing. To get back to the settlement part, in the settlement with DPROC, there was a general unrestricted release of DPROC. There was no mention of Ceja whatsoever. Now, under the common law, a release of one wrongdoer releases all wrongdoers for the same thing. The damage claimed and the wrong claims by Hassebrock in this whole thing is identical. And we put the pleadings in the record from the original DPROC lawsuit, wherein the damage claimed by Hassebrock is the damage which he suffered by reason of being excluded from this alleged joint venture. That's the same damage that he's claiming from DPROC. It's the same damage that he's now claiming against Ceja. That was settled. Except for the Contribution Act, which the courts have said doesn't apply to this kind of a case, a release of one wrongdoer releases them all unless there's something about the face of the agreement which limits it or which combines the facts outside that agreement which show an intent not to include other people. In this case, there is no other fact showing an intent not to include other people, nor is there any fact or circumstance showing that the recovery made by Hassebrock wasn't for the entirety of his claimed damages. In addition to the release, there was also relied upon in our motion an assignment done, signed by Hassebrock, wherein he assigned, and I want to read this, all his right, title, and interest in and to the oil and gas leases attached here to his Exhibit A, including, without limitation, interest under a certain assignment of a small interest. Those leases, Exhibit A, are all the leases which were referred to in the DPROC lawsuit. They were all of the oil and gas leases referred to in the recorded claim of interest, and they are all of the oil and gas leases which are referred to in the claim against Sahel Corporation. Now, not only did he assign those interests, he further, in the same assignment, said this, and for the same consideration, the act's in order to thereby forever release and disclaim any and all claims, rights, titles, or interests described in a notice of claim of interest dated May 14, 2002, and recorded in the office of the recorder of Marion County, Illinois, as document number such and such, and also forever releases and disclaims all claims, rights, titles, and interests in oil and gas leases in offsetting and adjoining Stephen Forbes State Park. That is to claim those are the oil and gas leases in which he is claiming an interest by virtue of this alleged joint venture with Sahel. He has disclaimed all right, title, and interest in any of the oil and gas leases which were the alleged subject matter of the claimed joint venture. He doesn't say in there half of them. He doesn't say DPROC's portion of them. He does not exclude anything about Sahel. It's everything. He settled his 100% claim against about all of these oil and gas leases in the settlement with DPROC. There's nothing left for him to have a claim against Sahel about. And clearly, those facts, which are undeniable because they're a record, clearly show that he was out of any deal he claimed to have had. He's done for. Now, the question was raised about Count 5 and why it would not be covered by the rules about written agreements. Well, first of all, that letter of October 1999 to which reference was made was not even close to a joint venture agreement. It was an agreement between Sahel, DPROC, and Hesselbrock under which Sahel agreed to perform at its cost certain seismic studies and that if it appeared from those studies that development of the leases was going to be worthwhile, that then DPROC and Sahel, I mean, DPROC and Hesselbrock would make assignments of certain fractional interest in various oil and gas leases to Sahel. It was simply an agreement to trade interest in oil and gas leases for the seismic work to be done by Sahel. It doesn't come close to being a joint venture agreement. Not even a smell of a joint venture. And so it stands alone. It is not referred to in Counts 1 through 4 at all as a claim against Sahel. In Count 5, there is a combination of claims against Sahel based on the letter of agreement and upon the alleged joint venture agreement because all the terms and conditions of the alleged joint venture agreement were pleaded in Count 5 by reference to the same allegations in Count 1. So Count 5 is a suit based upon an agreement partly oral and partly in writing. And the rule is that if you have a claim on an agreement partly oral and partly in writing, it's treated as an oral agreement and the five-year statute applies. The only way he could save himself on Count 5 is to have a claim on the written agreement alone, which I pointed out, in oral agreement, in oral argument. And I think I used those very words. That if he wants to save himself from the five-year statute in Count 5, he could amend and make a claim on the written agreement alone. He has not sought to do that. He comes in here. He's got Count 5, which is a combination of claim partly on a written agreement and partly on an oral agreement. And therefore, the five-year statute applies. The five-year statute clearly is wrong on all these claims. The wrongful conduct is alleged to have occurred in October and November of 2000 when it is claimed that Hasselbrock was wrongfully excluded from the claimed joint venture. It was clearly known about by Mr. Hasselbrock in May of 2002 when he filed his claim of record. Five years has clearly passed from that time to the date of the filing of the lawsuit. Now, complaints have been made that we waited too long to file our 619 motions. But we had, under Rule 219, we had until the time we filed our answer to file our motions, which we did. We can raise them again when we do file an answer, if need be. We felt that it was proper to wait until we had the pleadings well settled before filing a dispository motion. And that gets into the statement about the getting the coon free before we shoot it out. It is very difficult to get dispositive motions properly disposed of when the pleadings are unsettled, when we don't think they state a claim in the first place, when they're vague and perhaps not as clear as they should be. We finally, in the Sixth Amendment complaint, got a complaint that we felt was clear enough and specific enough that the court could make sense of a dispository motion. And therefore, as soon as the Sixth Amendment complaint was filed, within the time to plead to it, we filed our motions. I see nothing wrong with that at all. I think that is what the law of commonplace, and we had a right to do that. Whether we knew about it earlier or not is beside the point. I've seen lots of cases get messed up and motions denied when they're filed too soon, and the court really can't tell what the heck the complaint is really all about. And it's difficult to discern, really, what is the basis of that 619 motion, and how does it actually fit this complaint? So by the time the Sixth Amendment complaint was filed, we felt that the thing was firmed up enough and the claims were clear enough that the court could make sense out of our motions, which we then filed. And so they're certainly timely. A question has been raised about the fact that there's a claim that this is a continuing wrongful conduct. This is not a continuing wrongful conduct case at all. Whatever wrongful conduct is alleged was done in the year 2000, according to his pleadings, and it stopped. The fact that he may still continue to sustain damages from it doesn't change that. One of the cases that we cited is a pension case. There the entity that was supposed to pay a pension denied at the outset that the plaintiff was entitled to any pension benefits. And the court pointed out that when you decide to begin with to deny the claim, that's wrongful conduct. It stops. You don't get a new bite at the end of each month or each year that you don't pay. Had they started paying, had they acknowledged their obligation to pay, and then started paying for a few years and then stopped, then you'd have the case of possibly a continuing wrong each year or each month. But if you take the plaintiff's argument here to its logical extreme, you could just about never have a statute of limitations. For instance, statute of limitations to recover possession of personal property is five years. Now, if each day that you kept it was a separate violation, the five years would never run. If you have a note and the person says, I deny I made that note, I'm not paying you, I don't owe you any note at all, then that starts the statute of limitations. That's different from acknowledging the note and then stopping making payments as you go along. Adverse possession, possession of real estate, 20 years statute of limitations to retain, to regain possession of real estate. The wrong takes place, if there is one, when the adverse possessor takes possession. That's the date you start with. And then 20 years from then is the end of it. The fact that he continues to be in possession of someone else's property throughout the 20-year period is not a new offense each day or each minute. So what we have here is the alleged wrongful exclusion of Hasselbrock from this claim to venture. And that is alleged by the plaintiff to have occurred in October and November of the year 2000. Certainly well before May of 2002 when Mr. Hasselbrock filed his claim against this same joint venture and asserted a record that he had this claim. Let me ask you about your release argument, if I could. My which? Your release argument. Release? Oh, I'm sorry. I'm having a little trouble hearing. Okay, well, I'll speak up. All right, I'll work it out. In the lawsuit that was settled with the release, was Sahal mentioned? Sahal was mentioned as a party to the alleged joint venture. Sahal was mentioned, first of all, in the claim of interest that was filed by Mr. Hasselbrock. He described his interest in the venture as a venture which consisted of Deep Rock, Hasselbrock, and Sahal. And that was in the pleadings in the Deep Rock case, but Sahal was never a party to that lawsuit. Well, the release says that you're releasing disputes and controversies which have arisen between the parties and which have resulted in a lawsuit. So Sahal was never a party and never participated in the lawsuit that was pending in the Fourth Judicial Circuit, correct? That's correct. And you don't think that's a limitation on the release? I don't believe it is. An example of a release that would be that way is actually in the Rule 23 order that the plaintiff has cited in his brief. I'm not sure the basis for doing that, but it's all right with me because it's a good illustration. That was a suit against two obligors on note. A settlement was reached with the plaintiff with one of them, and that release specifically says we're releasing you as to one-half of the obligation on the note and one-half of the interest due. It went on to say that if a recovery couldn't be had against the other party by a certain time, then the plaintiff had some rights to a foreclosure mortgage to get the note paid. But that note, that release, on its face showed that it was for only a portion of the client. Well, you wrote this release? I wrote the release in negotiation with Mr. Hasselbrock's attorney, and we were jointly – I was a typist. My typist typed it because I have a better typist than he did. But it was negotiated between the two attorneys. Well, who are you representing? At the time of the release – I did not represent Sahal. Okay. In fact, I think at that time I had lawsuits pending against Sahal for other people. So this settlement agreement, which settles the lawsuit, you believe is still broad enough to include Sahal? Particularly when you include the assignment of interest that was required to be signed by Hasselbrock and signed and delivered, which assigned to DeBrock all of Hasselbrock's right title and interest in the leases, and also on the second page, displaying and released any and all claims which he had in any of these underlying oil and gas leases. Where is that? Where do you find that? That is in the – In the assignment? It's in our abstract, A-22. It's on Exhibit 3 in some – I could give it to you, but – I have it. It's there. And it says on the first page that he assigns all his right title and interest in and to the oil and gas leases attached here to his Exhibit A. Those are all leases that are subject to this lawsuit. Then on the back side, it says, and for the same consideration, the S&R does hereby forever release and disclaim any and all claims, rights, titles, and interests described in the Notice of Claim of Interest dated May 14, 2002. That is the claim of the joint venture, described as being the joint venture involving these leases and involving – and described in that claim as a joint venture between Deep Rock, Sahal, and Hassebrock. Does it use the word joint venture in here? In this assignment, no. It does it as claim of interest. Claim of interest. That's the claim of interest that Mr. Hassebrock recorded in the recorder's office in Marion County in May of 2002. And that's in the record? It is in the record, absolutely. We have a certified copy of it from the recorder, and we pass it as a copy of our motion. One last question. These exhibits, Exhibit 1 through 4, are generated as a result of the lawsuit settlement. That's correct. They're incorporated and referenced the lawsuit settlement. That's correct. They wouldn't exist but for this settlement agreement. That is correct. Okay, thank you. Thank you, Mr. Leahy, for your argument. Mr. Berkowitz, do you have rebuttal against regarding Sahal? I'm glad I saved a little bit of time. Twenty-five minutes, correct? I won't use nearly much. I don't know where to begin, but let's talk about the release. It's obvious that the parties never intended for Sahal to be included in the release. That's clear. He's abandoned that argument, it seems. He's now trying to make the argument that, well, somehow this assignment that Mr. Hassebrock entered into as part of the settlement agreement gave up all of his rights against Sahal for breach of fiduciary duty, for breach of the contract, for punitive damages, etc. That clearly was not the case. Clearly, it wasn't the intent of the parties. And that clearly wasn't accomplished by this assignment that he's raising on appeal. It wasn't even raised at the circuit court level. I mean, he's really grasping at straws. He never addresses the more troubling issue of judicial establishment. He states over and over again when he's trying to separate the lawsuits between Deitrog and Sahal that Sahal was not a party to that underlying lawsuit. Sahal was not governed by the settlement agreement. Specifically, I mean, I brought it to your attention in a brief and we brought it to your attention again in terms of the conflicts that I raised earlier when we were talking about Deep Rock, but he goes on to say over and over again, why would a stranger to the litigation should be made a party to a release escapes me as well? If there's a suit between two parties, there's not much reason that the two of them care about a release of some third party, not a party to the action. That is clearly judicial estoppel. Unequivocally, he has taken a position in another issue before the tribunal that is directly opposite to what he claims later on. There is no question about that. This is the man who drafts, the lawyer who drafts the settlement agreement, is telling the court here that Sahal is not a party to that agreement, governed by that agreement, not a part of that lawsuit, etc. That is judicial estoppel. There is no better example of judicial estoppel than what he's done in this particular case. Clearly, and then he tries to argue again this common law rule. We cited cases to the court that I think are important on that issue because, for example, we cited to the court the case involving the manufacturer and the dealer where the release of the manufacturer did not release the dealer from the dealer's liability in the case. Specifically, the courts went on to say that the, and I think we cited it to the court as well, in the case of Holmstrom v. Kunis, Illinois, however, has departed from the common law rule that he keeps saying gives it a release of one releases all. Illinois has departed from the common law rule and now declares that all joint contractual obligations are joint and several obligations. If you go back to the transcript, I was arguing that from day one. I was saying the reason why these two parties should be in the same lawsuit is because they're joint tortfeasors. And I even tried to ask the court to ask Mr. Lackey directly, are you going to claim, Mr. Lackey, that the payment that Deep Rock made to Mr. Hasselbrock is going to set off for the amount that he's going to recover from Seahawks? He never answered that question. So clearly, the case law does not support what he says as it relates to the release. It's judicially stopped. The release clearly doesn't include Seahawks. There is no ambiguity in that release. It was not the intention of the parties to release Seahawks but an underlying claim. And the claim that two and a half years later, what did he learn in two and a half years? If he had a lawsuit against Seahawks, he could have brought, he really truly believed that there was a release that barred a claim by Mr. Hasselbrock against Seahawks. He could have brought that from day one. Same as with the statute of limitations. Both of those are bogus. When we first filed the lawsuit, we mistakenly didn't attach the written agreement. Know what his motion was? Well, it should be dismissed because that written agreement wasn't attached. Now he claims on the statute of limitations that this isn't a written agreement, that this is an oral agreement. You don't get to do those things. You don't get to take conflicting positions in a litigation. This was clearly a written agreement all the way through. I'm not suggesting that every single term of the agreement was in that written document, but there are all the essential terms in there. So we clearly believe that the 10-year statute of limitations apply, and even if it doesn't, he's never addressed, you know, he mentioned it to you, it's kind of interesting because here's what the Supreme Court said about the very trouble he has with the continuing nature of a violation of this particular agreement. He said to you, well, that would mean every day afterwards that you could file a lawsuit because there would be a continuing violation. Here's what the Supreme Court said in the case involving, from the Fifth District, the Belleville-Toyota case. It is not true, as the defendants argued, that taken to its logical end, the trial court would have allowed plaintiffs to challenge the defendant's conduct indefinitely. Under the continuing violation rule, once the conduct stops, the statute of limitations begins to run. In this case, it never stopped. The same is true here. This isn't, I have your house, I have your car, whatever the case may be. This is continuing to produce oil. Every time they do that, it's a violation of that written agreement, and that allows us either, you could say it's a continuing nature, or as the Supreme Court said, each one of those is another five-year statute of limitations. So everything that they did within the five years would clearly be covered and wouldn't be barred by the statute of limitations. So I think for those reasons, and again, you know, he did mention one thing that I do want to bring it to you. There was never an answer filed in either case by the defendant. So this suggests that, you know, now we have these defenses that we could raise two-and-a-half years of litigation because everything was now clear as day. I think it's just absurd. We ask you to reverse these reports. Thank you. Thank you, Mr. Bartholomew. Thank you, Mr. Lackey. And we will take the matter under advisement and render it ruling.